# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
September 15, 2015

Plaintiff-Appellee,

v

No. 321340
Livingston Circuit Court
LC No. 13-021206-FC

RAULIE WAYNE CASTEEL,

Defendant-Appellant.

Before: BORRELLO, P.J., and HOEKSTRA, and O'CONNELL, JJ.

PER CURIAM.

Defendant appeals as of rights his jury trial convictions for terrorism, MCL 750.543f, felonious assault, MCL 750.82, three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, carrying a dangerous weapon with unlawful intent, MCL 750.226, and intentional discharge of a firearm from a motor vehicle, MCL 750.234a. For the reasons set forth in this opinion, we affirm.

## I. FACTUAL BACKGROUND

On October 16, 2012, defendant fired a 9 millimeter pistol out of the window of his vehicle, targeting five separate vehicles. The drivers of the vehicles generally testified that they heard a loud noise that they either immediately or subsequently realized was a gunshot. Later, each of the drivers discovered a bullet hole in either their vehicle or the tire of their vehicle. Bullets or bullet fragments were recovered. At trial defendant admitted that he had fired at the vehicles. He also admitted that he had seen media reports indicating that people were scared by the shootings. Nevertheless, on October 17, 2012, defendant again fired out of the window of his vehicle—this time along a different roadway—and struck another vehicle. Further, on October 18, 2012, defendant shot at additional numerous vehicles along three separate roadways. Again, the witnesses generally testified that they were scared, that their passengers and families were scared, and that they were either apprehensive about traveling along the targeted roadways or that they found alternate routes.

As a result of defendant's three-day random shooting spree, the local schools instituted a shelter-in-place policy, cancelled outdoor activities, increased communication with parents, and had an increased police presence until defendant was apprehended. Further, civilians expressed apprehension about traveling on the affected routes. The testimony indicated that they asked law enforcement about safety or alternative routes. There was also testimony that some people were

reluctant to travel at all or to allow their children to travel. There was also testimony from a Church in the area that they were forced to move their planned picnic to an area away from where the shootings had occurred.

Law enforcement formed an expansive task force solely for the purpose of apprehending defendant. The task force involved the following departments and agencies: (1) the Federal Bureau of Investigations, (2) the Bureau of Alcohol, Tobacco and Firearms, (3) the US Marshals Office, (4) the Michigan State Police, (5) the Department of Natural Resources, (6) the Secretary of State, (7) the Ingham County Sheriff's Department, (8) the Livingston County Sheriff's Department, (9) the Macomb County Sheriff's Department, (10) the Oakland County Sheriff's Department, (11) the Shiawassee County Sheriff's Department, (12) the Wayne County Sheriff's Department, (13) the Washtenaw County Sheriff's Department, (14) the Wixom police, (15) the Walled Lake police, (16) the Milford police, (17) the White Lake Township police, (18) the Farmington Hills police, (19) the Brighton Police, (20) the Lansing Police, (21) the Meridian Township police, (22) the Canton police, (23) the East Lansing police, (24) the Northville police, (25) the Plymouth Township police, (26) the Perry police, (27) the Detroit police, and (28) the Michigan State University (MSU) police. A tip line was set up and the police received and followed up on 2,960 tips. There was testimony about increased police presence on the affected roadways. The testimony further indicated that the task force was expensive and required numerous overtime hours for the involved officers, leaving other cases previously assigned to law enforcement personnel to be placed on hold.

Law enforcement officers located defendant based on information received from a witness that defendant was driving a dark-colored Malibu that had a very specific type of MSU alumni license plate holder. Using that information, law enforcement obtained a list of all Malibus within a six county area from the Secretary of State. Law enforcement officials then cross-checked that information with data from the National Insurance Crime Bureau in order to compile a list of vehicles in the correct color palate. Using that information, law enforcement officials generated names and addresses of individuals and started to systematically go through the list. The search eventually led to defendant, who allowed the police to take his 9 millimeter handgun in for testing. The ballistics tests indicated that defendant's handgun had fired all recovered bullets, bullet fragments, and shell casings.

At trial, defendant conceded all of the charges except for terrorism and assault with intent to commit murder. Defendant admitted that he fired all of the shots at the named victims, however he argued that he lacked the specific intent to commit those crimes because of his recently diagnosed mental illness. His claim of mental illness presented itself in a series of imaginary helicopter "fly-overs," which defendant perceived were coordinated by the military with his former employer. Defendant additionally asserted that he thought that "some government entity [was] controlling this computer technology—this advanced technology affecting us" leading to his wife having two miscarriages and his daughter suffering from eczema. Defendant also asserted that when he shot at the vehicles he did not specifically intend to kill anyone or to commit terrorism. The jury found defendant guilty of the lesser included offense of felonious assault. However, the jury rejected his argument that he lacked the specific intent to commit terrorism, finding him guilty. This appeal then ensued.

## II. DIMINISHED CAPACITY

On appeal, defendant first argues that he was denied his constitutional right to present a defense when the trial court prohibited him from presenting expert testimony regarding his mental illness. Whether defendant was denied his right to present a defense is a constitutional question that this Court reviews de novo. *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002). Defendant's claim also presents evidentiary issues. This Court reviews a trial court's decision to exclude evidence for an abuse of discretion. *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008). "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *Id*.

It is well established that the diminished capacity defense is no longer operable in Michigan. *People v Carpenter*, 464 Mich 223, 241; 627 NW2d 276 (2001). In *Carpenter*, our Supreme Court observed that the Legislature had enacted a comprehensive statutory scheme concerning defenses based on mental illness or retardation, and held that, as a result, the diminished capacity defense is no longer available. *Id*. at 230-232, 236, 241. Before this legislative activity and *Carpenter*'s interpretation of it, the diminished capacity defense allowed "a defendant, even though legally sane, to offer evidence of some mental abnormality to negate the specific intent required to commit a particular crime." *Id*. at 232. Here, in spite of his contentions to the contrary, defendant sought to introduce evidence that because of his mental illness he did not have the specific intent to commit terrorism when he fired at numerous vehicles over a three-day period.

Defendant argues that *Carpenter* amounts to an unconstitutional deprivation of his right to present a defense. However, in *Carpenter*, our Supreme Court expressly concluded that there was no constitutional right to present a diminished capacity defense. *Id*. at 240-241. The Court held: "[A] state is not constitutionally compelled to recognize the doctrine of diminished capacity and hence a state may exclude expert testimony offered for the purpose of establishing that a criminal defendant lacked the capacity to form a specific intent." *Id*. at 240-241 (citation omitted). Although defendant acknowledges that *Carpenter* squarely addressed the issue, he asserts that the United States Supreme Court's decision in *Holmes v South Carolina*, 547 US 319; 126 S Ct 1727; 164 L Ed 2d 503 (2006), undercuts the decision in *Carpenter*. In *Holmes*, the defendant sought to introduce evidence that a third party had actually committed the crime. *Holmes*, 547 US at 323. However, the evidence was excluded in light of the substantial forensic evidence presented by the prosecution. *Id*. at 323-324. The defendant argued that his constitutional right to present a complete defense had been violated. *Id*. at 324-325. The Court held that the rule prohibiting a jury from evaluating the strength of the defendant's evidence was arbitrary, did not have a legitimate end, and violated the defendant's right to present a complete defense. *Id*. at 331. Defendant appears to be arguing that, like the rule in *Holmes*, the rule precluding testimony of a defendant's diminished capacity is arbitrary, does not have a legitimate end goal, and violates his constitutional right to present a complete defense. However, as pointed out by the prosecution on appeal, the United States Supreme Court upheld an Arizona evidentiary rule that prohibits criminal defendants from using evidence of a mental disorder short of insanity to negate the specific intent of a crime. See *Clark v Arizona*, 548 US 735, 744-745, 779; 126 S Ct 2709; 165 L Ed 2d 842 (2006). Even if we were to agree with defendant's argument, which we do not, this Court is bound by the decision in *Carpenter*. See *People v Mitchell*, 428 Mich 364, 369-370; 408 NW2d 798 (1987) (holding that a majority decision by the Michigan Supreme Court "is binding upon lower courts.") Additionally, to the extent such a finding is even necessary; we find defendant's argument that *Carpenter* was undermined by

*Holmes* without merit. Accordingly, defendant had no constitutional right to present a diminished capacity defense and there was no constitutional error in the exclusion of the proposed expert testimony. Defendant is not entitled to relief on this issue.

Defendant alternatively argues that he was not attempting to present diminished capacity evidence. However, defense counsel argued to the trial court that the evidence of defendant's mental illness was "materially relevant to the essential element of specific intent to commit an offense." He asserted that if allowed he would have a mental health expert testify that defendant suffered from a serious mental illness known as persecutory type delusional disorder. He said that people with delusional disorders typically have "a skewed view of reality." He then listed a number of defendant's delusions, including delusions that he was being followed or monitored by people walking, people in vehicles with dark-tinted windows, and by military aircraft. He also noted that defendant believed his phone conversations and text messages were being monitored, that his photographs of the people following him had been stolen by the government, and that he was receiving messages from the announcers during a Detroit Tigers game. Further, he represented that defendant believed the cars he shot at "symbolized people who were following him and persecuting him;" and that he fired the weapon only to "rid the demons from his life . . . as opposed to trying to kill someone or terrorize a community." Defense counsel was arguing "that [defendant's] specific intent was to rid demons from—that were troubling his mind by acting," and that the testimony was necessary because it would explain defendant's counterintuitive behavior. We conclude that the proposed testimony was, in substance, a diminished capacity defense which was properly excluded under *Carpenter*. *Carpenter*, 464 Mich at 237.

Moreover, defendant was not denied the opportunity to present a defense. The trial court's decision only barred defendant from offering expert testimony on defendant's mental state at the time of the offense. See *People v Tierney*, 266 Mich App 687, 713-714; 703 NW2d 204 (2005). Defendant did in fact testify extensively regarding his intent during the event. He testified that nothing was planned, that he did not intend to shoot at people, that he only intended to shoot at cars, and that he never intended to terrorize, coerce, or kill anyone. In addition to defendant's testimony, defense counsel argued defendant's theory of the case to the jury and maintained that defendant did not intend to kill, harm, influence, or terrorize anyone. As in *Tierney*, "the trial court's ruling did not deny defendant his constitutional right to present a defense; rather, it merely denied defendant the right to present evidence of diminished capacity." *Id*. at 714. Accordingly, defendant is not entitled to relief on this issue.

## III. SUFFICIENCY OF THE EVIDENCE

Defendant next argues on appeal that there was insufficient evidence to convict him of terrorism. Challenges to the sufficiency of the evidence are reviewed de novo. *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002). When considering a claim of insufficient evidence, the "court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748, amended 441 Mich 1201 (1992). Determinations as to the weight of the evidence and the credibility of witnesses remain within the province of the trier of fact. *Id*. at 514-515 (citation omitted). "[A]ll reasonable inferences must be drawn in favor of the prosecution." *Id*. at 533.

-4-

To convict a defendant of terrorism, the prosecution must prove beyond a reasonable doubt that (1) the defendant acted knowingly and with premeditation and (2) that the defendant committed an act of terrorism. MCL 750.543(f)(1). An act of terrorism is statutorily defined in MCL 750.543b(a), which provides:

>    (a) "Act of terrorism" means a willful and deliberate act that is all of the following:

>    (*i*) An act that would be a violent felony under the laws of this state, whether or not committed in this state.

>    (*ii*) An act that the person knows or has reason to know is dangerous to human life.

>    (*iii*) An act that is intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion.

On appeal, defendant concedes that the acts he committed were violent felonies and that he knew or should have known that they were dangerous to human life. He also concedes that there was evidence that the acts intimidated or coerced the civilian population and that the acts influenced or affected the conduct of government. However, he contends that there was insufficient evidence that he *intended* "to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion" within the meaning of MCL 750.543b(a)(*iii*).

"[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind . . . ." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). Thus, "[c]ircumstantial evidence and reasonable inferences drawn from it may be sufficient to prove the elements of the crime." *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005). Further, the prosecution does not need to negate every reasonable theory of innocence. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). It is sufficient for the prosecution to prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. *Id*.

Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to establish that defendant intended to intimidate or coerce a civilian population. The evidence established that defendant fired at 23 vehicles over a three-day period. He admitted that he knew a firearm could cause death and that the bullets he used could penetrate steel. He also admitted that he had been instructed on firearm safety and the legalities of carrying a firearm during at least three firearms classes. He testified at one point that he did not have the weapon holstered because of the earlier shootings. He also acknowledged that on October 18, 2012, he had to reload multiple times. Further, there was witness testimony that defendant was laughing while he shot at least one of the witnesses. The jury could infer from his laugher that defendant enjoyed or was amused by his actions in shooting at the vehicles. In addition, defendant admitted that after the first five shootings, he knew that people were afraid and that the police

would have to respond to his actions. Further, defendant testified that he thought it was interesting that the overhead street lights on Loon Lake Road were shut off at night even with all the shootings going on. The jury could infer from that statement that during the period between when defendant started shooting and when he was apprehended, he was actively considering the police reaction and determining it to be inadequate. Moreover, defendant testified that after the media reports he suspected that he might "get a knock on my door someday."

With regard to the government, defendant testified about his delusional thinking in the years leading up to the October shootings. In particular he testified that he did not trust the government. He testified that he believed he lost his job because of the government; that the government was monitoring him and preventing him from obtaining employment; that the government was flying helicopters and airplanes over his house; that unidentified people with clipboards were following him even when he was taking part in everyday mundane life; that the government could negatively affect his medical treatment; and that government-controlled advanced technologies which caused his wife to miscarry twice, killed one of his cats, made the other cat ill for a time, and gave his daughter extreme eczema. He believed that the people in the vehicles he shot at were part of a government conspiracy and that they were monitoring him. From this evidence, a jury could reasonably infer that in spite of defendant's testimony, defendant actually was trying to send a message to the government to affect the conduct of government or a unit of government through intimidation or coercion by randomly shooting at people and awaiting the government's response. Moreover, defendant testified that he may have wanted to send the driver of a vehicle a message to "back off." A reasonable jury, given defendant's testimony that he believed the government was responsible for everything that had gone wrong in his life, could infer defendant was sending the same message to the government namely, to "back off."

Review of the record leads us to conclude that there was sufficient evidence to support the jury's conviction on the charge of terrorism. Accordingly, defendant is not entitled to relief on this issue.

## IV. POST-ARREST, POST-*MIRANDA* SILENCE

Lastly, defendant argues on appeal that his constitutional rights were violated when the prosecutor solicited testimony that defendant invoked his right to silence after arrest and after he was read his *Miranda*[1] rights. This issue is unpreserved because it was not raised before the trial court. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). To determine "whether an unpreserved claim of error warrants reversal under plain-error review," there must be an error, the error must be "plain, meaning clear or obvious," and the error must have affected "substantial rights," meaning "that the error affected the outcome of the lower court proceedings." *People v Shafier*, 483 Mich 205, 219; 768 NW2d 305, aff'd on reh 483 Mich 178 (2009) (internal quotation marks and citation omitted). Further, "reversal is only warranted if the error resulted in the conviction of an actually innocent defendant or seriously

---

[1] *Miranda v Arizona*, 384 US 436, 467-473; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

-6-

affected the fairness, integrity or public reputation of judicial proceedings." *Id*. (quotation marks omitted). "The defendant bears the burden of establishing prejudice." *Id*. at 220.

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." US Const, Am V. This amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. US Const, Am XIV; Const 1963, art I, § 17. When a criminal defendant is arrested, he is to be given his *Miranda* warnings as a prophylactic measure to protect him against incriminating himself. *Doyle v Ohio*, 426 US 610, 617; 96 S Ct 2240; 49 L Ed 2d 91 (1976). Once the defendant has been told, by means of the *Miranda* warnings, that he has a right to remain silent, it would be fundamentally unfair and would violate due process to use his silence "to impeach an explanation subsequently offered at trial." *Id*. at 618. Thus, once a defendant is arrested and given his *Miranda* warnings, he cannot be impeached during cross-examination regarding his failure to say anything to the police thereafter. *People v Borgne*, 483 Mich 178, 187; 768 NW2d 290 (2009).

In this case, the following exchange occurred between the trial prosecutor and a Michigan State police sergeant:

> *Q*. Okay. Were you back at that residence at all during that day?
>
> *A*. Later that evening when the determination was made to arrest on him, I returned to the residence with the emergency support team. And we made contact with him at the front door of his residence.
>
> *Q*. Okay. And what did you say to him, what did he say to you?
>
> *A*. At the time I advised him he was under arrest. That he'd be comin' back to the Wixom Police Department and we'd speak more when we got back there. He made no comment at all there or the ride back. When he returned to the Wixom Police Department with him, myself and another detective from the Wixom Police Department read him his Miranda rights. He refused to speak with us and evoked [sic] his privilege to counsel.

From the verbiage, it is clear that the prosecutor was seeking to elicit testimony regarding what defendant said when he was being arrested. Further, it is clear that there are two inappropriate references to defendant's silence: first, testimony that defendant did not make any comments after being told he was under arrest, and second, testimony that defendant did not make any comments after being read his *Miranda* rights. Thus, the testimony shows that error occurred and that it was plain or obvious. See *Shafier*, 483 Mich at 219.

In order to obtain relief, defendant must show that the error affected his substantial rights, i.e., that it affected the outcome of the lower court proceedings. *Id*. In *Borgne*, our Supreme Court noted that it was "difficult for an appellate court to know what effect the prosecutor's use of defendant's post-Miranda silence might have had on the jury." *Borgne*, 483 Mich at 197. In order to evaluate the effect the prosecutor's use of a defendant's post-arrest, post-*Miranda* silence, an appellate court should consider "(1) the extent of the prosecutor's comments, (2) the

extent to which the prosecution attempted to tie defendant's silence to his guilt, and (3) the relative strength of the other evidence against defendant." *Id*. at 197-198.

As to the extent of the prosecutor's comments, our review of the record leads us to conclude that the only reference to defendant's silence occurred during the exchange with the sergeant. The prosecutor did not follow up on the comments with additional questions, nor did he reference defendant's silence during opening statements, closing argument, or rebuttal argument. This was a lengthy trial, consisting of six days of testimony from 37 witnesses, including numerous police officers.

As to the extent to which the prosecution attempted to tie defendant's silence to his guilt, our review of the record reveals no evidence that the prosecutor made an effort to tie defendant's silence to his guilt. Instead, the reference to defendant's silence was limited to, what can best be characterized as the ill-conceived questioning of the police officer. Accordingly, like the prosecutor in *Borgne*, the prosecutor in this case "did not overtly tie defendant's post-arrest, post-*Miranda* silence to its argument that defendant was guilty of the charged crime." *Id*. at 199.

Finally, considering the other evidence of defendant's guilt, our review of the record reveals substantial, untainted evidence against defendant. Numerous witnesses testified that defendant fired a gun at them. Ballistics matched all of the recovered bullets and shell casings to defendant's firearm. One witness positively identified defendant's vehicle. Others described a similar vehicle that was in their vicinity. One witness testified that she saw defendant laughing as he passed her—after he shot at her vehicle. Moreover, defendant admitted that he had shot at the vehicles. Defendant also monitored the police and civilian reactions to the shootings and after learning that communities were panicked and a large police force was assembled solely to capture him, continued shooting his gun at innocent drivers. Given defendant's admissions and all of the other evidence herein cited, we cannot conclude that defendant was prejudiced by the prosecutor's ill-conceived reference to his silence. Accordingly, defendant has not met his burden of proving that his substantial rights were affected by the error. See *id*. at 202-203.[2]

---

[2] Defendant argues that deliberate violations of a defendant's right to silence should not be decided under the plain-error analysis. Defendant asserts that it can be concluded that the error in this case was deliberate because it is difficult to believe that the prosecutor and the sergeant were unaware of such a well-established prohibition. However, this assertion presumes the prosecutor who introduced the error was aware they were committing a legal error, a presumption for which there exists no evidence. Additionally, because we do not know why the prosecution introduced error into this trial, we cannot ascertain from the record whether the error was intentional. However, even if it were an intentional use of defendant's silence, defendant cites no authority indicating that the plain-error test should never be applied to these types of violations. Further, on this issue, our Supreme Court has applied the plain-error test set forth in *Borgne,* and absent direction from our Supreme Court to the contrary, this Court is compelled to follow the plain-error test in *Borgne*.

Affirmed.

/s/ Stephen L. Borrello
/s/ Joel P. Hoekstra
/s/ Peter D. O'Connell