*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLICATION
April 29, 2021

Plaintiff-Appellee,

v

No. 350755
Wayne Circuit Court
LC No. 19-003561-01-FC

NEAL JAMES DAVIS,

Defendant-Appellant.

Before: O'BRIEN, P.J., and STEPHENS and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial conviction of assault with intent to commit criminal sexual conduct (AWICSC), MCL 750.520g(1).[1]  The trial court sentenced defendant to a prison term of 17 months to 10 years.  We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant is the biological father of the victim, KD, and her minor brother.  Ashlee Sandifer (Sandifer) is the biological mother and custodial parent of the minor children.  Defendant and Sandifer's relationship ended in 2012, and Sandifer obtained custody of the children.  Defendant remained in periodic contact with Sandifer and the children.

In the early morning of December 26, 2018, Sandifer dropped off then seven-year-old KD and her six-year-old brother at defendant's house.  Sandifer testified that defendant did not normally watch the children; however, on the day of the incident, she had to work and could not find another sitter.  Defendant and his roommate, Alan Maxwell (Maxwell), were home.  KD and her brother watched television in the living room, ate cereal, and then went to lay down in

---

[1] Defendant was also charged with first-degree criminal sexual conduct (CSC-I), MCL 750.520b(2)(b), and second-degree CSC (CSC-II), MCL 750.520c(2)(b); however, the prosecution dismissed the CSC-II charge at trial and the jury acquitted defendant of the CSC-I charge.

defendant's bedroom. KD testified that defendant came into the bedroom and told his son to watch television in the living room. Defendant then laid down next to her on the bed and asked, "can you do me a favor?" According to KD, defendant pulled down her pants and underwear, touched her with his penis, and "put his private through [her] private." While defendant and KD were in the bedroom, Maxwell went into a nearby bathroom. Defendant stopped touching KD, waited for Maxwell to go back to his bedroom, and then told KD to go to the kitchen and wait for him there. Defendant joined KD in the kitchen and forced his penis into her mouth. KD then went to the living room to watch television with her brother but did not tell him what had happened.

Sandifer picked the children up from defendant's house later that afternoon. KD promptly told Sandifer what defendant had done. Sandifer got out of her vehicle, went into defendant's house, and confronted him with what KD had said, before driving to a Detroit police station, where Officer Latasha Adams took statements from KD and Sandifer. Sandifer then took KD to Children's Hospital, where KD told a female physician what had happened. Kirstin Neumann-Sweeney (Neumann-Sweeney), the Children's Hospital program coordinator, performed a forensic medical examination of KD, and testified that KD had told her she was there "because my dad took out his private part and put it next to my private part. And he took his private part and put it in my mouth and made me suck on it. He told me not to tell." Sweeney-Neumann collected oral, perioral (i.e., of tissues around the mouth), buccal, labial, and perianal swab DNA samples from KD. Sweeney-Neumann testified that she did not observe any physical injuries to KD and that KD was calm, cooperative, and inquisitive during the exam; however, Sweeney-Neumann stated that it was not unusual for there to be no physical injuries and that KD's behavior was "pretty typical" for children. In January 2019, defendant voluntarily went to the Detroit police station, was interviewed by Officer Adams and Corporal Blake Eaton, and submitted a buccal swab DNA sample.

At trial, three Michigan State Police Crime Laboratory forensic scientists testified for the prosecution regarding DNA evidence. Mikehl Hafner testified that he had performed a test on KD's swab samples that looked for the presence of Y chromosomes, i.e., male DNA, concluding that only KD's perioral swab tested positive for male DNA. Jennifer Jones (Jones) testified that she then performed a further DNA analysis on KD's perioral swab sample that separated the sample into two fractions—fraction one containing epithelial (skin) cells and fraction two containing sperm cells—and looked at how many DNA contributors were present in each fraction. Jones concluded that while the epithelial perioral swab sample contained male DNA, there was not enough male DNA to see and interpret; therefore, defendant was excluded as a contributor for purposes of that analysis. There was no male DNA present in the sperm cell fraction. Jones testified that these results indicated that additional testing was required to magnify the male DNA in the epithelial perioral sample. Katie Urka (Urka) testified that she then performed a Y-STR test on KD's epithelial perioral sample and concluded that the male DNA present in that sample matched defendant, although she stated that she expected that it would also match all of defendant's paternally-related male relatives. Urka testified that the Y-STR test was necessary because KD's DNA had "overpowered" the male DNA in the sample, by virtue of the sample having been taken from her body.

The jury convicted defendant as described. After sentencing, defendant moved the trial court for new trial or a *Ginther*[2] hearing, arguing that (1) the prosecution had used evidence implying that defendant's DNA was found near KD's mouth when a DNA test had specifically excluded defendant; (2) his trial counsel had failed to explore Sandifer's motive for making the allegation that had resulted in the charges filed against defendant; and (3) his trial counsel had failed to call Maxwell as a witness, and that Maxwell would have testified that he did not see defendant assault KD. The prosecution argued that defendant was not entitled to a *Ginther* hearing regarding DNA issues or Sandifer's motives, but agreed that defendant was entitled to a hearing regarding his counsel's decision not to call Maxwell as a witness, because Maxwell was allegedly present in the home during the incident and there was a possibility that his testimony could have affected the outcome of defendant's trial.

The trial court held a *Ginther* hearing. Defendant testified that he and his trial counsel had never discussed Maxwell not testifying, but that trial counsel had merely asked for Maxwell's telephone number and that defendant had given it to him. Defendant testified that he had always intended to have Maxwell testify, but that he did not discuss it with trial counsel during the trial because "that whole experience, was brand new to [him]." Maxwell testified that he was at defendant's house on the day of the incident and did not see anything that concerned him. Maxwell further testified that he never spoke to trial counsel despite being willing to testify. Additionally, defendant testified that he told trial counsel about cellular phone videos taken on the day of the incident. Defendant stated that the videos depicted an approximately 20-minute period and showed that his children were playing around like normal. Further, defendant testified that before the incident, he had received a call from the KD's school telling him that KD had been "beaten" and "was complain' that she couldn't breathe." However, defendant did not recall who he had talked to, did not file a police report, and did not attempt to change custody, to retrieve KD from school, or to contact Children's Protective Services (CPS).

Trial counsel testified that defendant had told him that Maxwell was at defendant's house on the day of the incident and that, contrary to Maxwell's testimony, he had spoken to Maxwell before trial; however, after talking to Maxwell, trial counsel determined that Maxwell's testimony would not be beneficial to defendant, stating:

> The problem that I saw with it was that [Maxwell] was gonna testify that, uhm, he saw [defendant] and his daughter, in a room, alone, together.

> * * *

> [T]he other reason, was I didn't think that I needed his testimony, because the D.N.A. taken from the child, uh, it showed the presence of a male D.N.A., but it wasn't from [defendant]. And so, uh, I didn't think that it was wise for me to bring up the person, or the next suspect that it could have been [i.e., Maxwell].

Trial counsel stated that he had explained to defendant his concerns about Maxwell's testimony and they had decided that Maxwell would not be called as a witness, to which defendant did not

---

[2] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

object at any point throughout the trial. Additionally, trial counsel testified that he was not aware of any videos from the day of the incident. Trial counsel stated that such videos "would have been real germane[,]" but that he did not "remember any videos surfacing about events that took place inside of the home." Further, trial counsel testified that he had focused his strategy on the DNA test that had excluded defendant as a contributor to the male DNA found on KD, stating:

> I know there were two reports, and uhm, two findings. One was more general, and one more specific. . . . [Report two] was written by Jennifer Jones . . . it reads, in part, [defendant] is excluded as a possible donor[.]

> * * *

> [Report three] was the more general one. . . . Where it said, the perioral, perioral lips and mouth swabs, fraction number one, matches . . . [defendant], and would be expected to match all other, uhm, paternally related males.

The trial court denied defendant's motion for a new trial. This appeal followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel was ineffective because he failed to (1) call Maxwell as a witness; (2) introduce video evidence at trial; and (3) investigate and question Sandifer as to her potential motive for creating false allegations against defendant.[3] We disagree.

Whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review for clear error a trial court's factual findings, but we review issues of constitutional law de novo. *Id*.

The effective assistance of counsel is presumed and defendant bears a heavy burden to prove otherwise. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). A defendant claiming the ineffective assistance of counsel must overcome the strong presumption that counsel's actions constituted sound trial strategy under the circumstances. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). To establish ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced defendant that he was denied the right to a fair trial. *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). To establish prejudice, a defendant must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *People v Johnson*, 451 Mich 115, 124; 545 NW2d 637 (1996); see also *People v Jurewicz*, ___ Mich ___; 948 NW2d 448 (2020), *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

---

[3] Defendant also argues that his trial counsel was ineffective in failing to object to DNA evidence. We will discuss that issue in Part III of this opinion.

Defendant argues that his trial counsel was ineffective in failing to call Maxwell as a favorable witness who would have testified that he did not see defendant sexually assault KD on the day of the incident, and that, as a result, he was denied the right to present a defense. We disagree. The decision whether to call or question witnesses is generally presumed to be a matter of trial strategy. *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012).

Defendant has not overcome the presumption that trial counsel's decision not to call Maxwell was the product of sound trial strategy. Trial counsel's testimony at the *Ginther* hearing was that he was aware of Maxwell but did not consider calling him as a witness because "he [Maxwell] was gonna testify that, uhm, he saw [defendant] and his daughter, in a room, alone, together." Further, KD testified that defendant's actions occurred when Maxwell was not present. Excluding Maxwell as a witness was not an objectively unreasonable decision; Maxwell's testimony would not have refuted KD's testimony, and would have contradicted defendant's claim that he was never alone with her that day. *People v Davis*, 250 Mich App 357, 369; 649 NW2d 94 (2002).

Moreover, defendant has not established that the outcome of his trial would have been different had Maxwell testified. Defendant argues that Maxwell would have testified that he was at defendant's house on the day of the incident and did not observe any abuse. Specifically, Maxwell testified at the *Ginther* hearing that on the day of the incident, he was in his bedroom with the door open until defendant's children ate breakfast, and that he, defendant, and the children then watched television and played games until Sandifer arrived. However, Maxwell's testimony was significantly contradicted by other witnesses' testimony. KD testified that she only saw Maxwell when he came out of his bedroom to use the bathroom and when she talked to Sandifer on the telephone, and she stated that Maxwell was not present when she and her brother watched television. Defendant himself testified that Maxwell was not present with the children the entire day. Maxwell's testimony would, at best, have only been that he did not observe any sexual abuse, not that he *would have* seen any abuse if it had occurred. In light of the limited value of his testimony, defendant has not established a reasonable probability that the outcome would have been different if Maxwell had testified. *Johnson*, 451 Mich at 124.

Defendant also argues that his trial counsel was ineffective in failing to obtain and introduce into evidence videos from the day of the incident. We disagree. Defendant has failed to establish the factual predicate for this claim, i.e., that trial counsel knew or should have known of these videos. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Although defendant argues that the videos were discussed before trial at the final trial conference, we note there is no record of the video evidence being mentioned at the final pretrial conference, nor is there any other evidence suggesting that trial counsel had knowledge of the existence of the videos.

Even if trial counsel was aware of the video evidence, defendant has failed to establish that the failure to offer them as evidence constituted ineffective assistance of counsel. Defendant argues the video evidence would have shown that KD was in close contact with her brother, which would explain why KD's perioral swab revealed the presence of paternally-related male DNA. However, assuming that the videos were taken on the day of the incident, the video evidence spans about 20 minutes of the entire 8-hour period that defendant was watching his children. It was not disputed that KD was in close proximity to her brother that day, as she testified that she sat next to him on the couch to watch television and laid down with him in defendant's room before the

incident. Additionally, according to defendant himself, the videos were recorded when defendant was not in the house and before the incident occurred. It is difficult to see the relevance of such video evidence apart from confirming that KD was in proximity to her brother that day. Further, while one of the videos admitted at the motion hearing showed KD kissing her brother's bare foot, indicating a possible DNA transfer, defendant failed to establish that the video was from the day of the incident.

Further, the elements of AWICSC are (1) an assault, meaning an attempt to commit a battery or an unlawful act that places the victim in reasonable apprehension of an imminent battery; and (2) intent to commit criminal sexual conduct involving sexual penetration. *People v Nickens*, 470 Mich 622, 627-628; 685 NW2d 657 (2004). "[A] battery is an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *Id*. (quotation marks and citation omitted). As we will further discuss later in this opinion, AWICSC does not require physical contact for conviction and the jury could have convicted defendant without relying on DNA evidence at all. Defendant has not demonstrated either that his trial counsel was unreasonable for failing to offer this evidence at trial or that he was prejudiced by this failure. *Johnson*, 451 Mich at 124.

Defendant also argues that his trial counsel was ineffective for failing to investigate Sandifer's potential motive for creating false allegations of sexual assault against defendant. As noted, "[d]ecisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy[.]" *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). This Court "will not second-guess counsel on matters of trial strategy, nor will we assess counsel's competence with the benefit of hindsight." *Id*. Defendant contends that at the time of the incident, Sandifer was about to lose custody of her children, and that if trial counsel had adequately questioned Sandifer about coaching KD to make sexual assault allegations, the jury would have discounted KD's testimony and not convicted defendant. However, the record does not indicate whether defendant ever communicated this theory to trial counsel, nor is there any evidence that shows Sandifer at risk of losing custody. Further, defendant admitted that after allegedly being told that KD was physically abused, he made no attempt to retrieve her from school, to change custody, to file a police report, or to contact CPS. And the record is devoid of any evidence that Sandifer had coached KD or otherwise attempted to fabricate evidence of sexual assault. Defendant has failed to overcome the strong presumption that trial counsel engaged in sound trial strategy by not pursuing a strategy of arguing that Sandifer was motivated to make false sexual assault allegations. *Horn*, 279 Mich App at 39.

## III. DNA EVIDENCE

Defendant argues the trial court erred by denying his motion for a new trial on the ground that the DNA evidence used to convict him was false. Additionally, defendant argues trial counsel was ineffective for failing to object to the admission of the DNA evidence. We disagree.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objections that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 116; 631 NW2d 67 (2001). Likewise, to preserve a due process or prosecutorial misconduct argument for appellate review, a defendant must raise an objection on that ground in the trial court." *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007);

*People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011).  Because defendant did not object to the admission of the DNA evidence or of testimony from any of the prosecution's forensic experts or raise his due process argument in trial court, the issue is not preserved for appellate review.

Generally, this Court reviews for an abuse of discretion a trial court's decision to admit or exclude evidence.  *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014).  We review de novo constitutional questions, including due-process rights and issues of prosecutorial misconduct.[4]  *People v Borgne*, 483 Mich 178, 184; 768 NW2d 290 (2009); *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).  However, unpreserved evidentiary and constitutional issues are reviewed by this Court for plain error affecting a defendant's substantial rights.  *Id*.  "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights."  *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).  Once these requirements are met, reversal is required only when the plain error "resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence."  *Id*. at 763-764 (quotation marks and alterations omitted).

"Due process requires that the evidence show guilt beyond a reasonable doubt in order to sustain a conviction."  *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008).  In general, "[p]rosecutors are accorded great latitude regarding their arguments and conduct during trial."  *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (quotations marks and citation omitted).  Prosecutors are "free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case."  *Id*. (quotation marks and citation omitted).  "[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial."  *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007).  "A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence."  *Id*. at 63-64.  "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context."  *Id*. at 64.  A defendant has the burden of showing that the challenged evidence used by the prosecution was actually false.  *People v Bass*, 317 Mich App 241, 272; 893 NW2d 140 (2016).

The trial court did not err by denying defendant's motion for a new trial.  Defendant argues that the prosecution inappropriately used the DNA evidence to imply to the jury that defendant committed the charged offense even though he was excluded as a contributor to the DNA. Defendant's argument is unpersuasive and lacks merit.  As discussed, the jury heard testimony regarding the three-step procedure for testing KD's perioral swab sample.  The first step revealed that male DNA was present around her mouth.  The second step, which analyzed whose DNA was

---

[4] This Court has explained that a more appropriate label for most claims of prosecutorial misconduct would be "prosecutorial error," while only the most extreme cases rise to the level of "prosecutorial misconduct."  *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). Because defendant accuses the prosecution of relying on false evidence rather than mere technical error, we use the phrase "prosecutorial misconduct."  *Id*.

present, did not identify any male contributor because KD's DNA essentially overshadowed the male DNA. The third step amplified and focused on the male DNA only, revealing that defendant's DNA matched the male DNA present around KD's mouth. Defendant concludes the second step excluded him as a DNA match, ignoring the results from the first and third steps. Taken together, it is clear that the second step was merely one component in the overall DNA analysis. The results of that step did not invalidate the findings of the Y-STR test performed on the sample in the third step.

Defendant alternatively suggests that the male DNA evidence was actually from KD's brother because the children were in close proximity and video evidence showed KD kissing her brother's bare foot. However, defendant failed to establish at the evidentiary hearing that the video evidence was from the day of the incident. Additionally, the male DNA around KD's mouth corresponds with her testimony that defendant put his penis in her mouth. Defendant has not demonstrated that the DNA evidence was actually false and cannot meet his burden of demonstrating that the admission and use of such evidence at trial constituted plain error that affected his substantial rights. *Bass*, 317 Mich App at 272. Likewise, any objection by trial counsel to the admission of this evidence would have been meritless and futile. *Henry*, 305 Mich App at 141.

Additionally, defendant has not shown that if the DNA evidence had been excluded at trial, the outcome would have been different. Again, AWICSC requires an assault and intent to commit criminal sexual conduct involving sexual penetration, which does not require physical contact for conviction. *Nickens*, 470 Mich at 627-628. As a result, the DNA evidence was not necessary to convict defendant of AWICSC. Additionally, from the record, it appears that, in convicting defendant, the jury relied more heavily on KD's testimony than on the DNA evidence. It is reasonable to conclude that, had the jury primarily relied on the DNA evidence that defendant had touched KD's mouth with his penis, the jury would have convicted defendant of CSC-I.

For similar reasons, defendant has not demonstrated that his trial counsel was ineffective in failing to call a defense DNA expert. Defendant argues that a defense expert could have testified that the third step in the DNA analysis, matching his DNA to the male DNA found on KD, was irrelevant because defendant had already been excluded as a contributor. However, as we have discussed, this argument lacks merit. Nor does defendant identify a specific DNA expert who would testify in support of this argument. *Id*.

Lastly, defendant argues that the erroneous admission of the DNA evidence resulted in a compromise verdict. "[A] jury is free to believe or disbelieve, in whole or in part, any of the evidence presented." *People v Perry*, 460 Mich 55, 63; 594 NW2d 477 (1999). "[I]t is the role of the jury, not this Court, to determine the weight of the evidence or the credibility of witnesses." *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012). Jury compromise occurs when some of the jurors agree to convict a defendant on one count, although they did not believe beyond a reasonable doubt that the defendant was guilty of that count, in exchange for the agreement of other jurors to acquit the defendant of another count. *People v Lewis*, 415 Mich 443, 451-452; 330 NW2d 16 (1982). However, "a jury's acquittal on one charge in a multi-count indictment signals no more than the jurors' agreement not to convict on that charge for whatever reason satisfactory to them." *Id*. at 450. Juries "have the power to acquit as a matter of leniency." *Id*. at 449.

Our review of the record does not indicate any confusion or disagreement among the jurors as to their verdicts. During deliberations, the jury sent three questions to the trial court, none of which concerned the merits of the charges or the weight of the evidence. Instead, the jury's questions included a request for the trial transcript and forensic reports and clarification as to whether Maxwell was defendant's cousin or friend. Additionally, the jury was not polled by either party at the conclusion of the trial. Defendant's argument is merely speculative and does not warrant relief.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Cynthia Diane Stephens
/s/ Mark T. Boonstra