*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
June 27, 2024

v

No. 358142
Saginaw Circuit Court
LC No. 13-039423-FC

STEPHON LARON ROBY,

Defendant-Appellant.

Before: O'BRIEN, P.J., and M. J. KELLY and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right[1] his jury-trial convictions of two counts of first-degree premeditated murder, MCL 750.316(1)(a), three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1), and one count of felon in possession of a firearm (felon-in-possession), MCL 750.224f. Defendant was sentenced as a third-offense habitual offender, MCL 769.11, to serve concurrent terms of life in prison without the possibility of parole for his first-degree murder convictions, a concurrent term of 6 to 10 years in prison for his felon-in-possession conviction, and terms of two years' imprisonment for each of his felony-firearm convictions that were to be served concurrently with each other but consecutively to defendant's other sentences. Because cumulative errors deprived defendant of a fair trial, we vacate defendant's convictions and remand for a new trial.

## I. FACTUAL BACKGROUND

Defendant's mother, Leigh King, and his 11-year-old sister were killed in March 2013. Defendant claimed that he had been out the night before, briefly slept on the couch, then left again to obtain college transcripts and a tattoo. Defendant stated that he called 911 after he returned from getting a tattoo and noticed what looked like blood. The screens were off of two windows

---

[1] Defendant's appellate rights were reinstated after the trial court determined in June 2021 that defendant had been deprived of his right to appeal.

and the windows were open, although the dirt on the windowsills and the snow underneath the windows were undisturbed. Defendant agreed to participate in a police interview.

## A. POLICE INTERVIEW

During the first police interview, defendant stated that he had seen his mother and sister the night before and that he and his sister had argued over his sister's tablet. Defendant said that he left for a strip club at about 1:00 a.m. and got home at about 5:00 a.m., but he also said that he was home before 4:00 a.m. and retrieved the tablet from his sister's room at about 1:00 a.m. After defendant stated that he had gone into his sister's room to retrieve the tablet, the two police detectives conducting the interview began to assert their beliefs that some dispute arose concerning the tablet. Defendant denied that any such thing happened. The detectives indicated that defendant had mental instabilities that might have resulted in something that he did not mean to happen, that his mother would want him to tell the truth, and that his mother, God, and Jesus would forgive him if he told the truth.

After a break for food, defendant indicated that he wanted to go home. Defendant was told that he could not go home because the crime lab was processing the home. Detectives resumed stating that defendant's mother would be disappointed in him and would want him to tell the truth, resumed talking about defendant's medication, and asked whether they should tell the prosecutor that defendant did not care about his mother or sister. Defendant was shown crime-scene pictures of his mother and sister, and asked whether a demon or devil had made him act and whether he heard voices. The following exchange then took place:

> [*Detective Two*]. Was your mom first? Was your sister first? Stephon, you do know.
>
> *A.* Can I leave now? Y'all said I ain't under arrest. So can I leave?
>
> [*Detective Two*]. I'm sorry. What's that?
>
> *A.* Can I leave now?
>
> [*Detective One*]. Well we're—we're still . . .
>
> [*Detective Two*]. We have some questions for you.
>
> *A.* Okay, but I'm not under arrest?
>
> [*Detective Two*]. That's 'cause we're still talking.

The first detective then asked if defendant was on probation and what his probation conditions were, and defendant's answer indicated that he had violated his probation. After further discussion of defendant's medication, the following exchange took place:

> [*Detective Two*]. Is that what made your mom—is that what you—made you mad with your mom—she wouldn't get your medication?

> *A.* Can I leave?
>
> [*Detective One*]. If you didn't do this, who did?
>
> *A.* Can I leave?
>
> [*Detective One*]. Well we're gonna have to talk to your probation officer.
>
> *A.* Well I didn't do it. I don't care. Can I leave?
>
> [*Detective One*]. Why don't we go check with your probation officer?
>
> *A.* All right.

Defendant stated that he had not been read his rights, that he wanted to leave, and that he was ready to leave. Defendant was told that he was not free to leave. After a discussion between defendant and a State Police officer about whether defendant had violated his probation, the following exchange took place:

> [*State Police Officer*] . . . . Yeah. I'm not—I'm not here to argue with you. I'm telling you what they're looking into. It's not my call. Okay?
>
> *A.* Well can we get me a lawyer?
>
> [*State Police Officer*]. What's that?
>
> *A.* Well I wanna get me a lawyer then.
>
> [*State Police Officer*]. Do you want—okay. You don't want to talk to me at all?
>
> *A.* I don't feel I still need to be here. I'm just saying.

Defendant was then provided with *Miranda*[2] warnings. While issuing the warnings, the officer stated, "People are calling like crazy. We're getting a bunch of different stuff. We may have something wrong. You're the one closest to this. You're the one who knows what's going on the most. All right? So if we have something wrong we wanna change it." He also indicated, "Now, you have to be willing to give up those rights 'cause you mentioned you wanted an attorney." Defendant repeatedly asked whether the officer would allow him to go home. Defendant was told that he could not leave the room, and defendant asked whether officers could call his probation officer so that he could explain the situation. After defendant was denied a phone call, he stated that he "might need to talk to a lawyer" and asked, "So can I talk to my probation officer and can I talk to a lawyer?" After defendant spoke over the phone with someone, the interview ended.

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

During a second interview, defendant was given *Miranda* warnings. An officer indicated that defendant's grandmother was present and asked whether defendant would like to speak with the officers or his grandmother. Defendant responded that it did not matter. Defendant's grandmother asked defendant to be truthful and tell her what had happened to defendant's mother and sister. Defendant stated that he did not know and that he found them after he returned from getting his tattoo, and the following exchange took place:

> [*Defendant*]. I don't wanna talk to you no more. I'd rather talk to them.
>
> [*Defendant's Grandmother*]. You gonna talk to them?
>
> [*Defendant*]. I'd rather talk to a lawyer and I'd rather go home.

Defendant then repeatedly stated that he did not want to talk anymore. Subsequently, in response to questions, defendant indicated that he had snuck into his mother's bedroom and taken the keys to her truck from her purse, which was under the bed.

After further discussions with his grandmother about locations and times, defendant was again questioned by a police officer. Defendant indicated that he fought with his sister about the tablet after his mother made dinner and that he got the tablet from his sister's room, and he again stated that the keys had been in his mother's room, in her purse, under the bed. The interview ended when defendant began asking about his lawyer.

## B. SELF-REPRESENTATION

During a pretrial hearing in February 2014, defendant asked whether he could represent himself. The trial court instructed defendant to make a request, speak with counsel, and discuss motions that he wanted to file with counsel. The court opined that defendant would be making a mistake if he chose to represent himself, and told defendant to provide his attorney with motions so that they could be filed and noticed.

In April 2014, defendant again requested to represent himself. Defendant testified that he was 22 years old and had completed a year of college. The trial court informed defendant of the charges and penalties, and informed defendant that representing himself would be foolish. Defendant affirmed that he understood the charges, and he engaged in a discussion with the trial court about what his responsibilities would be if he were to represent himself. The court found that defendant had unequivocally requested to represent himself, considered whether defendant's self-representation would burden the court, and granted defendant's request. The court informed defendant that, if he had any motions to file, they needed to be filed by April 17, 2014.

After defendant's request to represent himself was granted, defendant's standby counsel petitioned for a competency hearing on the basis that defendant's family had reported that defendant had been diagnosed with a mental illness. Defendant received two competency evaluations, which indicated that defendant had been hospitalized twice and diagnosed with paranoid-type schizophrenia. However, the evaluators opined that defendant had average cognition and did not display any signs of acute mental illness. During the evaluations, defendant

discussed his case in a rational manner, and he indicated to the evaluators that his attorney had not filed his motions.

In August 2014, the trial court determined that defendant was competent to stand trial. Defendant indicated that he wanted to file his motions; standby counsel indicated that defendant had provided him with "paperwork" but not detailed motions. In September 2014, standby counsel requested an independent examination regarding criminal responsibility.[3] At the same hearing, defendant again requested to file his motions because standby counsel had still not filed them. Defendant stated that he had a copy of his motions with him, and they were provided to standby counsel, who filed them and noticed them for a hearing.

Defendant's *in propria persona* motions are difficult to read and contain unconventional spelling and grammar, but they are clearly labeled as nine motions, most of which sought to have the charges dismissed on the basis of insufficient evidence, or evidence suppressed due to a lack of credibility on the part of the witnesses. One motion, however, sought in part to suppress evidence on the basis that defendant had been denied his right to counsel. The prosecution objected to the motions because they had not been legibly printed. At the motion hearing, the trial court indicated that it would provide defendant with a typewriter. The prosecutor subsequently indicated that defendant's motions had not been timely filed, and the trial court agreed and denied defendant's motions.

## C. TRIAL

On the first day of trial, the court found that, on the basis of its examination that day, defendant had unequivocally requested to represent himself; his waiver of his right to counsel was knowing, intelligent, and voluntary; and the court had advised defendant of the disadvantages of self-representation. Defendant's opening statement drew attention to the circumstantial nature of the evidence, and discussed the charges and what the prosecution had to prove.

Numerous witnesses testified about defendant's attempts to purchase a gun before the shooting. Defendant's sister's best friend testified that, a few days before the murder, defendant's sister discovered the front half of a gun with a duct-taped back under defendant's mattress. According to defendant's sister's friend, defendant's sister gave the gun to her mother, defendant and his mother argued, and defendant left while saying that he would burn the house down or kill them. Defendant's aunt testified that, while attempting to find life-insurance papers in the home, she discovered a gun stock, a journal in defendant's handwriting, a Monopoly-board style agenda that included steps from "start" to "kill confirm," and what appeared to be an attempt to practice Leigh's (defendant's mother's) signature. The journal described some of defendant's prior convictions, a plan for being paid for insurance fraud for his mother and sister, and statements that he had obtained a rifle and planned the perfect getaway.

Defendant objected to admission of the evidence on the basis that it had been the product of an illegal search. As part of a separate record, defendant's aunt testified that she had not been

---

[3] Ultimately, the independent evaluation was consistent with defendant's first two evaluations.

searching for the items at the behest of police. One of the detectives testified that the police report contained a typographical error concerning which date the subsequent search warrant was issued. The trial court found that the items had been discovered by a private citizen who was not acting on behalf of the police.

The medical examiner testified that the victims had been in full rigor mortis when they were discovered and that he estimated that defendant's sister had been shot between 1:00 a.m. and 7:00 a.m. Defendant cross-examined the medical examiner regarding how temperature affected rigor mortis. A forensic scientist testified that a white t-shirt discovered inside a jersey on the front couch had apparent blood stains that matched defendant's sister's DNA. On cross-examination, the scientist agreed that fresh blood could transfer from one surface to another, and that it was possible to enter the home and go into the living room without seeing any visible blood.

The first detective who testified at trial said that, shortly into defendant's interview, it became apparent to him that defendant was responsible for the murders, and defendant objected:

> *Q.* During that first conversation, what was—what was it you were trying to do with Stephon?
>
> *A.* Well, just to get basic information at the beginning but it just became apparent, like within the first 20 minutes of an hour of questioning him, that he was responsible for their deaths. He was emotionally disconnected to the fact his mother and his sister had just been murdered
>
> THE DEFENDANT. I object to that.
>
> THE COURT. It's going to be overruled. He can describe what he saw but—is that what you're doing?
>
> THE DEFENDANT. When he said that—he said that he figured he had a person who did it right there at that time. Supposed to be considered innocent until proven guilty at a court of law.
>
> THE COURT. You are, but he can describe your emotional state.

The first detective subsequently responded to several questions with nonresponsive answers that witnesses had told him that defendant had tried to kill his mother and sister before, or that his mother had been afraid that defendant would kill her. The detective also testified that defendant had stated "that he snuck into the bedroom, got [car keys] out of [Leigh's] purse, at which point she would have been deceased at that time, anyway."

Defendant questioned the first detective about a statement by defendant's next-door neighbor that she had heard someone kicking in a door at 2:00 a.m. and saw a man wearing a long coat and gloves. Defendant attempted to ask the detective about whether he had searched for that person:

> *Q.* . . . I just asked you when did you make an attempt to search for an individual that she described?

*A*.  The individual she described, unless it was you, is not a suspect in this case because you were at home at 2:00 a.m. in the morning.

*Q*.  When did you search for that individual?

*A*.  We did not search for that individual.

*Q*.  So it is possible you could have let a murderer go and try and again—

*A*.  The evidence shows that you are the murderer.

*Q*.  So is it possible?  Yes or no?

*A*.  No, it is not possible.

When asked what characteristics of defendant matched those given by the neighbor, the detective responded, "The whole [neighbor] thing is irrelevant because you would have been home at 2:00 a.m. if someone was kicking in the door."  When asked to explain whether someone could have kicked the front door open and why it appeared that the doorknob had been tampered with, the detective opined that defendant probably did it because the evidence showed that defendant had committed the crime.

During defendant's case-in-chief, he called the second detective, who responded to direct questions by defendant with statements that he believed that defendant shot his sister and that the evidence showed that he was the murderer.  The second detective agreed when defendant asked him whether witnesses had stated that Leigh feared for her life, and when asked to explain why defendant had not been arrested earlier, he responded that defendant had been under arrest for a probation violation.  Defendant also asked the second detective about the second possible suspect:

*Q*.  And you also stated that you actually knew there was a suspect and you participated in that search?

*A*.  Correct.

*Q*.  After hearing the description of the suspect, did you feel you had the guy that did it?

*A*.  Yes.

*Q*.  And can you explain to me why?

*A*.  Because the evidence led to one person and we did look for the suspect. We didn't have to look far.  You were right under our nose and we had you there.

A similar exchange occurred when defendant asked the second detective whether it was possible that he was innocent:

*Q*.  Is it possible that I'm actually innocent?

*A.* No.

MR. KING [the prosecutor]. Objection.

THE COURT. Sustained.

MR. KING. I'll accept the answer.

During closing, defendant argued that the detectives' theories of defendant's sister's movements through the house were inconsistent and implausible, that blood could have transferred to his t-shirt from the blood in the house, that he could not have cleaned up as fast as the detectives asserted in order to be at a strip club at 4:00 a.m., that the temperature in the house and the victims' being in rigor mortis established that the shooting occurred after defendant left the house, and that no witness had testified that he had possessed a gun. He argued that the remainder of the evidence was hearsay or unreliable. Defendant further argued that a notebook talked about a plan to collect life insurance, but there had been no life insurance on Leigh; he argued that it was possible that Leigh had planned to kill defendant and defendant's sister because she had life insurance on them. Defendant also relied heavily on the existence of a man who had been seen outside the home at about 2:00 a.m. but whom the police had not investigated. The jury found defendant guilty as previously described.

This appeal followed.

## II. SELF-INCRIMINATION

Defendant raises two arguments concerning whether he was improperly questioned by police officers during his interviews. He first argues that police officers failed to provide him with *Miranda* warnings despite subjecting him to custodial interrogation. Second, defendant argues that officers improperly continued questioning him after he unambiguously invoked his right to counsel. We agree with both arguments.

As an initial matter, we deem this issue preserved. To preserve an issue for appeal, the defendant must raise it before the trial court at the time that the court has an opportunity to correct the error. *People v Pipes*, 475 Mich 267, 277; 715 NW2d 290 (2006). In his *in propria persona* motion in limine, defendant argued in part that he was denied his right to speak with an attorney after he requested one during his police interview.

Defendant's motions were denied on the basis that they were untimely. However, criminal prosecutions must comply with "prevailing notions of fundamental fairness." *People v Anstey*, 476 Mich 436, 460; 719 NW2d 579 (2006), quoting *California v Trombetta*, 467 US 479, 485; 104 S Ct 2528; 81 L Ed 2d 413 (1984) (quotation marks and citation omitted). When defendant initially indicated that he wanted to represent himself, he was informed that if he had any motions, they needed to be filed by April 17, 2014. At the subsequent hearing on April 14, 2014, defendant complained that he was not being treated as his own attorney because the court was communicating with standby counsel rather than him. Defendant complained at competency evaluations in May and June 2014 that his attorney had not filed his motions, and he asked to file his motions at every subsequent hearing. It is apparent from the later statements of standby counsel that he had interpreted defendant's motions as "paperwork" and did not file them. It is not fundamentally fair

to treat defendant's motions as untimely when defendant provided the motions to standby counsel—thus following the procedure prescribed by the trial court for filing defendant's motions—but the motions were not timely filed due to standby counsel's oversight or misunderstanding.

Generally, whether a defendant was in custody for the purposes of *Miranda* warnings is a mixed question of fact and law. *People v Barritt*, 325 Mich App 556, 561; 926 NW2d 811 (2018). This Court reviews for clear error the trial court's factual findings about the circumstances surrounding a defendant's incriminating statements and reviews de novo conclusions of law. *Id*. This Court reviews de novo constitutional questions. *People v Borgne*, 483 Mich 178, 184; 768 NW2d 290 (2009).

## A. CUSTODIAL INTERROGATION

First, defendant argues that he was in custody when he made incriminating statements because a reasonable person in defendant's position would not have felt free to terminate the interrogation and leave. We agree that the majority of factors support that defendant was in custody when he made incriminating statements without the benefit of *Miranda* warnings.

A "custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 US at 444. "Custody" is a legal term of art that requires a court to determine whether, under the objective circumstances of the interrogation, a reasonable person would have felt at liberty to terminate the interrogation and leave. *Barritt*, 325 Mich App at 562. When considering the circumstances of the interrogation, this Court considers

> (1) the location of the questioning, (2) the duration of the questioning, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning. [*Id*. at 562-563 (citations omitted).]

The subjective views of officers and the accused do not have any bearing on the objective determination of whether a defendant was in custody. *Id*. at 568.

In this case, the location of questioning was a police station. While a police station is a police-dominated atmosphere, that fact is not determinative. *Barritt*, 325 Mich App at 563. See *Oregon v Mathiason*, 429 US 492, 495; 97 S Ct 711; 50 L Ed 2d 714 (1977). Courts have considered whether the defendant was transported to the station in the back of a patrol vehicle, whether the defendant was forced into the car, and whether the defendant was placed under arrest. *Barritt*, 325 Mich App at 566. In this case, defendant was transported in the back of a patrol car. However, defendant was told that he was not under arrest, and he stated that he did not have a problem speaking with the police. There is no indication that he was forced into the car.

As part of the first factor, this Court also considers whether the doors to the room were locked. *Id*. at 567. In this case, defendant was told that the door was unlocked but closed for privacy. Officers came in and out, but it appears that defendant was escorted by officers when moving from one interview room to another, and he was left in the rooms during breaks.

Considering all these circumstances, we conclude that a reasonable person in defendant's position would not feel free to terminate the interrogation and leave.

The second factor to consider is the duration of the questioning. *Barritt*, 325 Mich App at 562. The questioning here extended from some time in the early afternoon until after business hours. One of the questioners acknowledged that defendant had been there a long time. The length of the questioning weighs in favor of concluding that a reasonable person in defendant's position would not feel free to terminate the interrogation and leave.

The third factor concerns statements made during the interview. *Barritt*, 325 Mich App at 562. Whether a defendant was informed that the defendant was free to leave is one consideration that weighs against a defendant's having been in custody. *Id*. at 571. However, a defendant's request for permission to leave indicates that the defendant did not believe that the defendant was free to leave. *Id*. at 573-574. Stated otherwise, how would "a reasonable person in the position of the individual being questioned . . . gauge the breadth of his or her 'freedom of action' '"? *Id*. at 574, quoting *Stansbury v California*, 511 US 318, 325; 114 S Ct 1526; 128 L Ed 2d 293 (1994).

In this case, defendant initially was told that he was not under arrest. However, when defendant stated that he wanted to go home, the first detective told defendant that he would not be allowed to leave because the crime lab was at his home. Defendant later repeatedly asked whether he could leave, which indicates that defendant was looking for permission to leave. After one request to leave, the officers told defendant that they still had questions for him and that he was not under arrest " 'cause we're still talking," implying that defendant was not actually free to leave unless he met their conditions. We conclude that this factor weighs in favor of a determination that defendant was in custody.

An increasingly accusatory nature of an interview may also weigh in favor of a finding of custody under the third factor. *Id*. at 570-571. An officer's statements that a defendant is not telling the truth and requests that a defendant be honest indicate an increasing level of aggression. *Id*. at 572. In this case, early in the interview, the detectives began to indicate that they did not think that defendant was telling the entire truth. The subsequent interview is marked with increasingly coercive statements, such as indications that if defendant had committed a crime, he would be caught, so he might as well confess; that people who had mental instabilities but were not on medication might struggle and do things that got out of hand; that if defendant loved his mother and sister, he would say what happened; that defendant had been raised to tell the truth and his mother would want him to tell the truth; and that God, Jesus, and his mother would forgive him if he admitted his sins. These are similar to the sorts of statements that are reasonably likely to elicit an incriminating response. See *id*. at 573. The increasingly accusatory nature of the interview weighs in favor of a determination that a reasonable person in defendant's position would not feel free to leave.

The fourth factor is the presence of physical restraints. *Id*. at 575. A defendant need not be handcuffed to be physically restrained. *Id*. A defendant may not feel free to leave if the defendant is asked to ride to the police station in the back of a patrol car, is in the presence of at least one armed police officer at all times, and the heated tone of an interview includes a threat. *Id*. In this case, as previously discussed, defendant was driven to the police station and escorted

by police. However, the doors were not locked, and there is no indication that the officers were armed or that the tone itself became heated. Without anything more, this factor is neutral.

The fifth factor is the release of the interviewee at the end of questioning. *Barritt*, 325 Mich App at 563. In this case, it was strongly implied that defendant was not under arrest because he was still speaking with the police. Defendant was questioned about his probation conditions, and defendant admitted that he had not complied with them. Defendant was ultimately told that he was being detained and should consider himself not free to leave. Because defendant's release was conditioned on his continued cooperation and he was not released after the interview, this favors a determination that defendant was in custody.

On the balance of the factors, we conclude that they weigh in favor of defendant's having been in custody because a reasonable person in defendant's position would not feel free to terminate the interrogation and leave.

That defendant was in custody does not end the inquiry, however. We must also address whether defendant was subject to an interrogation while in custody.

Not all statements that a person makes in custody result from an interrogation. *Rhode Island v Innis*, 446 US 291, 299; 100 S Ct 1682; 64 L Ed 2d 297 (1980). An interrogation occurs when "a police practice is designed to elicit an incriminating response" on the basis of the objective manifestation of the officer's words. *People v White*, 493 Mich 187, 195-196; 828 NW2d 329 (2013). A subtle compulsion is not an interrogation. *Id*. at 197. Courts consider whether there is evidence of coercive pressures or other psychological intimidation. *People v Elliott*, 494 Mich 292, 312; 833 NW2d 284 (2013). Courts may consider the sharpness of the tone of questions or a defendant's indication that the defendant does not want to speak. *Id*. Courts may also consider psychological intimidation and accusations that the defendant is lying. See *Barritt*, 325 Mich App at 583.

In this case, the nature and tone of the officers' questions became reasonably likely to elicit an incriminating response when officers began to ask defendant what happened concerning his sister's tablet. The questions that followed included statements that defendant might as well get a confession out of the way, that he was mentally unstable, and that he should be truthful to do right by his mother. Officers appealed to defendant's sense of religion and the concept of religious forgiveness, and they stated that it might appear to others that defendant did not care about his mother or sister. Defendant was shown crime-scene photographs of his mother and sister. Defendant repeatedly asked to go home or to leave. The objective facts indicate that defendant was interrogated.

Although defendant's statements regarding taking his sister's tablet out of her room occurred before the interview became a custodial interrogation, defendant's incriminating statements that he had taken his mother's keys from the purse under her bed, that he could have woken her up to ask whether he could use the vehicle, and that his mother had not given him permission to use the vehicle were incriminating statements that defendant made after being subjected to custodial interrogation. We conclude that defendant has sufficiently identified incriminating statements that he made regarding his mother while subject to custodial interrogation, and these statements were presented as evidence during trial and relied on during

the prosecution's opening and closing statements. We will consider the prejudicial effect of these statements in our cumulative-error analysis.

## B. REQUEST FOR COUNSEL

Second, defendant argues that he was subjected to further questioning without an attorney after he requested counsel. We agree that the police violated defendant's Fifth Amendment rights when they did not end their custodial interrogation after defendant unambiguously requested an attorney. Defendant's rights were then further violated when the police initiated a second day of interrogation without counsel present.

A suspect's confession is inadmissible if police violated the suspect's right to have counsel present at an interrogation. *People v Tanner*, 496 Mich 199, 208; 853 NW2d 653 (2014). "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v US*, 512 US 452, 461; 114 S Ct 2350; 129 L Ed 2d 362 (1994). If the accused requests an attorney, "the interrogation must cease until an attorney is present." *Miranda*, 384 US at 474.

Invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v United States*, 512 US 452, 459; 114 S Ct 2350; 129 L Ed 2d 362 (1994) (quotation marks and citation omitted). See *People v Adams*, 245 Mich App 226, 237; 627 NW2d 623 (2001). The question is whether the request for counsel is articulated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 US at 459. Ambiguous or equivocal references to an attorney do not require police officers to cease questioning the accused. *Adams*, 245 Mich App at 237. A defendant's question about whether the defendant can speak with an attorney is not sufficient to invoke the right to counsel. *Id*. at 238. Similarly, the statement "[m]aybe I should talk to a lawyer" is not a clear, unequivocal request for counsel. *Davis*, 512 US at 462.

In this case, defendant's request for an attorney was clear and equivocal. After a discussion between the officers about whether defendant had violated his probation, the following exchange took place:

> [*State Police Officer*] . . . . Yeah. I'm not—I'm not here to argue with you. I'm telling you what they're looking into. It's not my call. Okay?
>
> *A*. Well can we get me a lawyer?
>
> [*State Police Officer*]. What's that?
>
> *A*. Well I wanna get me a lawyer then.

Defendant was not asking whether he could have an attorney, or asking whether he should talk to an attorney; he stated that he wanted to get a lawyer. Defendant's statement was articulated in such a way that a reasonable police officer would have understood that the statement was a request for an attorney.

After defendant unambiguously requested an attorney, officers should have ceased interrogating him. A defendant's exercise of a right to cut off questioning must be scrupulously honored. *Michigan v Mosley*, 423 US 96, 104; 96 S Ct 321; 46 L Ed 2d 313 (1975). "To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." *Id*. at 102. Police should not "persist[] in repeated efforts to wear down [the defendant's] resistance and make him change his mind." *Id*. at 105-106.

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v Arizona*, 451 US 477, 484; 101 S Ct 1880; 68 L Ed 2d 378 (1981). The purpose of ceasing questioning when the defendant invokes his right to counsel is "in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers . . . ." *Oregon v Bradshaw*, 462 US 1039, 1044; 103 S Ct 2830; 77 L Ed 2d 405 (1983). When a suspect initiates dialogue with the authorities after requesting counsel, the prosecution has the burden to establish that the subsequent events constituted a waiver of the defendant's right to have counsel present during the interrogation. *Id*. at 1044. "[T]he proper inquiry is whether the defendant reinitiated a conversation on the subject matter of the investigation and whether, under the totality of the circumstances, the defendant knowingly and intelligently waived his rights to counsel and to remain silent." *People v Clark*, 330 Mich App 392, 418; 948 NW2d 604 (2019).

The record reflects that, after defendant invoked his right to counsel, he did not initiate further conversation with the officers; rather, they initiated further interrogation. Again, an interrogation occurs when "a police practice is designed to elicit an incriminating response" on the basis of the objective manifestation of the officer's words. *White*, 493 Mich at 195-196. Merely asking whether the accused has changed their mind about speaking without the presence of an attorney is not an interrogation. *People v Kowalski*, 230 Mich App 464, 479; 584 NW2d 613 (1998). Instead, "[t]he functional equivalent of interrogation includes any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*., quoting *Innis*, 446 US at 301 (quotation marks omitted).

This is not a case in which defendant indicated that he changed his mind and wished to speak with the officers before officers resumed questioning him. Following defendant's statement that he wanted an attorney, the State Police officer continued making statements that sought an incriminating response, such as that "[p]eople are calling like crazy. We're getting a bunch of different stuff. We may have something wrong. You're the one closest to this. You're the one who knows what's going on the most. All right? So if we have something wrong we wanna change it." Defendant repeatedly stated that he wanted to go home; he never stated that he wanted to give up his right to an attorney or to speak with police. Only in response to repeated attempts to draw defendant into incriminating statements did defendant request to speak with his probation officer.

Additionally, there is no indication that defendant initiated the second day of interrogation, where defendant made incriminating statements. When it is clear that a party has invoked the right to an attorney, the police may not return to question the accused the next day without a request or

-13-

suggestion by the accused. *Edwards*, 451 US at 487. A defendant's statement that the defendant does not want to talk to anyone indicates that the defendant did not suggest or request the meeting. See *id*. Police must wait 14 days until the accused is out of custody to eliminate the coercive effect of custody. *Maryland v Shatzer*, 559 US 98, 110; 130 S Ct 1213; 175 L Ed 2d 1045 (2010).

The record indicates that defendant was held for a probation violation following the first interview and was brought out for the second interview because there "had [been] some further developments in the case and stuff like that." When asked whether he wanted to talk to the officers or to his grandmother, defendant indicated, "It don't matter." This is not the sort of unequivocal statement suggesting that defendant wished to reinitiate questioning. The remainder of the interview confirms that defendant did not, in fact, want to be interrogated without an attorney. For instance, defendant stated to his grandmother that he did not want to talk to her, that he would rather talk to a lawyer, and that he would rather go home. Defendant was then asked further questions by his grandmother, including whether he had been driving without a license, and what he had been driving. Defendant subsequently made incriminating statements, such as that he had taken his mother's keys from the purse under her bed, that his mother had not given him permission to drive the vehicle, and that he did not try to wake her up to obtain permission to drive the vehicle. Ultimately, we agree that the police officers violated defendant's right against compelled self-incrimination by continuing to question him despite his request for an attorney, and that this violation led to incriminating statements that were used against defendant at trial. We will consider the prejudicial effect of these statements in our cumulative-error analysis.

## III. EVIDENTIARY ERRORS

Defendant next argues that his due-process rights were violated when police officers were permitted to testify that defendant was guilty of the crime and that his rights to confrontation were violated when police officers repeatedly offered hearsay testimony. We agree that the first detective's repeated, unresponsive opinion testimony about defendant's guilt violated defendant's due-process rights and that the trial court clearly erred by admitting continued opinion testimony and hearsay statements offered by that detective. Although the prejudice of these errors was mitigated by the similar testimony that defendant elicited from the second detective, the first detective's statements were more extensive. The trial court further plainly erred by admitting evidence of defendant's prior criminal activity.

## A. PRESERVATION AND WAIVER

To preserve an issue for appeal, the defendant must raise it before the trial court at the time that the trial court has an opportunity to correct the error. *Pipes*, 475 Mich at 277. Defendant partially preserved this issue by objecting to the first detective's testimony that it was apparent while questioning defendant that he was responsible for the murders. However, defendant did not challenge the remainder of this detective's opinions regarding his guilt or his hearsay testimony.

The prosecution argues that defendant opened the door to testimony about his guilt by objecting to it only one time and then eliciting further testimony. We agree that defendant elicited improper testimony from the second detective, and thus, he has waived his challenges to that testimony. However, we do not agree that defendant waived his challenge to improper statements

-14-

by the first detective when that detective's answers were not responsive to defendant's questions, and we do not agree that the second detective's statements entirely mitigated the error.

A waiver is the "intentional relinquishment or abandonment of a known right." *People v Carines*, 460 Mich 750, 763 n 7; 597 NW2d 130 (1999) (quotation marks and citation omitted). A person who waives a right may not seek appellate review of the claimed deprivation of that right because the waiver extinguishes any error. *People v Buie*, 491 Mich 294, 305; 817 NW2d 33 (2012). A waiver occurs when the defendant voluntarily places evidence in the record. *Id*. at 307. When the defense calls a witness for the specific purpose of giving hearsay testimony, the defendant has waived any objection to the witness's testimony. *People v Riley*, 465 Mich 442, 448; 636 NW2d 514 (2001). When properly admitted evidence corroborates a witness's improper testimony, it is less likely that the error affected the outcome of the lower court proceedings. See *People v Jones*, 468 Mich 356; 662 NW2d 376 (2003).

Defendant challenged the first detective's opinion that defendant was guilty, and his objection was overruled. This testimony was given during the prosecution's direct examination, and it was not responsive to the prosecutor's question. The first detective gave similarly non-responsive testimony that defendant had previously tried to kill his mother and sister before in response to one of defendant's questions. Likewise, when asked about why a doorknob was tampered with, the first detective opined that defendant probably did it because the evidence showed that defendant had committed the crime. He responded to defendant's question about whether Leigh's on-and-off relationship partner felt comfortable around defendant by answering that the partner stated that if defendant ever got his hands on a gun, defendant would use it. He offered a similar nonresponsive statement when asked whether the partner had stated that defendant had a gun in his bookbag. Defendant preserved his challenge to the first detective's initial statement about defendant's guilt, and he did not waive his challenges on appeal to the first detective's non-responsive improper testimony because defendant did not elicit it.

However, defendant did waive any challenge to the second detective's opinion and hearsay testimony. Defendant was the party who called the second detective as a witness. Defendant's questions to the second detective directly asked whether it was possible that defendant was truthful and whether defendant was actually innocent. The second detective also agreed with defendant's statement that a witness told him that Leigh feared for her life. By eliciting these answers, defendant waived his challenges on appeal to the second detective's opinion and hearsay testimony.

## B. STANDARD OF REVIEW

Generally, this Court reviews de novo whether a defendant's right to due process has been violated. *People v Propp*, 508 Mich 374, 380; 976 NW2d 1 (2021). This Court reviews a trial court's decision regarding whether to admit testimony for an abuse of discretion. *People v McFarlane*, 325 Mich App 507, 517; 926 NW2d 339 (2018). The trial court abuses its discretion when it admits testimony that is inadmissible as a matter of law. *Id*.

This Court reviews unpreserved issues for plain error. *Borgne*, 483 Mich at 184. An error is plain if it is clear or obvious, and it affects substantial rights if it affected the outcome of the lower court proceedings. *Carines*, 460 Mich at 763. "An error is plain when it is contrary to well-

settled law." *Swenor*, 336 Mich App at 564. Whether a plain error affected the outcome of the lower court proceedings requires consideration of the weight of the properly admitted evidence. *Pipes*, 475 Mich at 280.

## C. LEGAL STANDARDS

The Michigan and United States Constitutions provide that no person shall be deprived of liberty without due process of law. US Const, Am XIV; Const 1963, art 1, § 17. As previously stated, criminal prosecutions must comply with "prevailing notions of fundamental fairness." *Anstey*, 476 Mich at 460; 719 NW2d 579 (2006) (quotation marks and citation omitted). The presumption of innocence "is a basic component of a fair trial under our system of criminal justice." *Estelle v Williams*, 425 US 501, 503; 96 S Ct 1691; 48 L Ed 2d 126 (1976).

> To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt. [*Id*.]

## D. OPINIONS REGARDING DEFENDANT'S GUILT

Defendant argues that the trial court abused its discretion when it permitted the first detective to testify that defendant was guilty of the crime over defendant's objection, and that the court committed plain error when it allowed the detective to make additional statements about defendant's guilt. We agree.

"A witness may not opine about the defendant's guilt or innocence in a criminal case." *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012). Opinions about a defendant's guilt or innocence impermissibly invade the province of the jury. *McFarlane*, 325 Mich App at 523. When an opinion about a defendant's guilt "is proffered by an officer of the law, the error seriously affects the fairness, integrity, or public reputation of the proceedings." *People v Bynum*, 496 Mich 610, 633; 852 NW2d 570 (2014).

The trial court abused its discretion when it admitted the inadmissible opinion of the first detective that defendant was guilty of murdering Leigh and defendant's sister. Despite defendant's objection, the trial court permitted the detective to testify that "it just became apparent, like within the first 20 minutes of an hour of questioning [defendant], that he was responsible for their deaths." This is a clear statement of a police officer's belief about defendant's guilt. The trial court's admission of this irrelevant and highly prejudicial evidence affected the fairness of defendant's proceedings.

Further, the trial court committed a clear or obvious error by allowing the first detective's additional testimony about defendant's guilt, even though defendant did not challenge this testimony. The inadmissible statements included that "[t]he evidence shows that you [defendant] are the murderer" and "the evidence shows that you committed this crime." These opinions clearly invaded the province of the jury. Although the prejudicial effect of these statements was somewhat mitigated by statements that defendant later elicited from the second detective, the first detective's

-16-

statements did not entirely lack prejudice, and we will consider the prejudicial effect of these statements in our cumulative-error analysis.

## E. HEARSAY

Defendant argues officers repeatedly offered hearsay evidence in response to defendant's questions, violating his right to confrontation.

Both the United States and Michigan Constitutions protect a defendant's right to confront the witnesses in a criminal case. US Const, Am VI; Const 1963, art 1, § 20. The improper admission of hearsay may implicate the defendant's state and federal constitutional rights. *People v Dendel (On Second Remand)*, 289 Mich App 445, 452-453; 797 NW2d 645 (2010). "Although any error can potentially be argued to have deprived a defendant of his due-process fair-trial right, not every trial error is constitutional in nature." *People v Blackmon*, 280 Mich App 253, 261; 761 NW2d 172 (2008).

At the time of defendant's trial, hearsay was defined as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Former MRE 801(c).[4] Hearsay is inadmissible unless it is subject to a hearsay exception. *People v Duncan*, 494 Mich 713, 724; 835 NW2d 399 (2013). If a statement contains multiple layers of hearsay, each layer must fall within a hearsay exception. MRE 805.[5]

When defendant asked the first detective why defendant would not have killed Leigh sooner if he previously had a gun and knives, the first detective testified that two witnesses told him that Leigh woke up with a knife to her throat. In response to defendant's question about whether Leigh's on-and-off relationship partner had stated that defendant had a gun in his bookbag that he took to school, the first detective testified that the partner had told him that he had found a gun in a bookbag, the doghouse, and the backyard, and that Leigh had been scared that defendant would kill her. When asked what evidence linked defendant to the crime, the detective stated that at least seven people told him that Leigh had stated that defendant would kill her and that she was afraid for her life. In all of these instances, the detective's testimony was not responsive to the question and contained multiple levels of hearsay.

Although the prejudicial effect of these statements was somewhat mitigated by statements that defendant later elicited from a second detective and the testimony of defendant's sister's friend that she directly overhead defendant threaten to kill Leigh and defendant's sister, the first detective's statements did not entirely lack prejudice. No one else testified that Leigh had stated that she woke to defendant standing over her with a knife. And no other testimony suggested that Leigh told at least seven people that she feared that defendant would kill her—the second detective merely agreed that a witness had told him that Leigh feared for her life. Like the prejudicial effect

---

[4] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ___ Mich ___ (2023).

[5] The language of MRE 805 has not substantially changed.

of the first detective's opinion testimony about defendant's guilt, we will consider the prejudicial effect of the first detective's hearsay testimony in our cumulative-error analysis.

## F. OTHER-ACTS EVIDENCE

Third, defendant argues that the extensive admission of other-acts and character evidence constituted plain error. We agree that the trial court committed a clear and obvious error by admitting evidence of defendant's other crimes.

At the time of defendant's trial, MRE 404 provided in pertinent part as follows:

(a) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) Character of Accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same; . . .

(b) Other Crimes, Wrongs, or Acts.

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

(2) The prosecution in a criminal case shall provide written notice at least 14 days in advance of trial, or orally on the record later if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial and the rationale, whether or not mentioned in subparagraph (b)(1), for admitting the evidence. If necessary to a determination of the admissibility of the evidence under this rule, the defendant shall be required to state the theory or theories of defense, limited only by the defendant's privilege against self-incrimination.

This rule addresses the underlying concern that a jury may convict a defendant on the inference that the defendant has a bad character rather than because the defendant is guilty of the crime charged. *People v Thurmond*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 361302); slip op at 5. Evidence of relevant other acts does not violate MRE 404(b) "unless it is offered solely to show the criminal propensity of an individual to establish that he acted in conformity therewith." *People v VanderVliet*, 444 Mich 52, 65; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).

Although defendant argues that the prosecution did not provide notice of its intent to admit other-acts evidence, some of the evidence on which defendant relies was introduced by defendant,

and a party may not appeal an error that the party created. *People v Szalma*, 487 Mich 708, 726; 790 NW2d 662 (2010). In response to defendant's question regarding why charges against him had not been filed until months later, the first detective testified, "The fact that you were on probation and you violated your probation gave us a lot more time." Accordingly, testimony that defendant violated his probation is not at issue.

However, evidence of defendant's other crimes were admitted, and this evidence was not elicited by defendant. Reading from defendant's journal, defendant's aunt testified that defendant had a drug conviction, had been arrested for carrying a concealed weapon, had been arrested for fleeing and obstructing, and had been arrested for possession of alcohol as a minor. It was clearly erroneous to admit evidence of defendant's other crimes and criminal acts, and this evidence that was admitted was much more extensive than the probation-violation testimony that defendant elicited. As with the other errors identified in this opinion, the prejudicial effect of this improperly admitted evidence will be considered in our cumulative-error analysis.

## IV. CUMULATIVE ERROR

Defendant argues that the cumulative effect of all the errors identified in this opinion warrants a new trial. Considering the strength of the evidence against defendant combined with the fact that defendant mitigated the prejudicial effect of some of the erroneously-admitted evidence by admitting similarly prejudicial evidence himself, this is a close call. On balance, however, we agree with defendant that the cumulative effect of the several errors in this case deprived defendant of a fair trial.

The trial court maintains the duty to ensure that the fact-finding process in a criminal trial is fundamentally fair. *Estelle*, 425 US at 503. Not every error by the trial court deprives a defendant of a fair trial, however. This concept is reflected in MCL 769.26, which states:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

"In examining whether a miscarriage of justice occurred, the relevant inquiry is the effect the error had or reasonably may be taken to have had upon the jury's decision." *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010) (quotation marks and citation omitted). "[T]he cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not." *People v LeBlanc*, 465 Mich 575, 591; 640 NW2d 246 (2002). To warrant finding that a defendant was denied a fair trial on the basis of cumulative error, "the effect of the errors must have been seriously prejudicial." *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001).

As identified throughout this opinion, there were many errors in defendant's trial. These errors include a preserved error of constitutional magnitude that resulted in the admission of defendant's incriminating statements about having been in Leigh's bedroom that were obtained

after defendant was deprived of his privilege against self-incrimination. Additional errors included (1) a preserved error regarding the first detective's testimony about defendant's guilt, and (2) unpreserved errors concerning the first detective's testimony regarding defendant's guilt, his hearsay testimony, and admitting evidence of defendant's other crimes.

Still, even without this impermissible evidence, the case against defendant was strongly incriminating. And while the first detective made a number of improper statements, the prejudicial effect of many of those statements was mitigated by evidence that defendant elicited from the second detective. Additionally, defendant did not present a particularly strong defense—defendant's theories that officers had failed to investigate a suspect outside the home and that it was not logical that defendant would have waited so long to kill Leigh and his sister if he previously had weapons around them were not particularly persuasive arguments, particularly in response to the prosecution's evidence incriminating defendant.

Nevertheless, defendant established that there was at least some evidence that another individual might have been kicking a door at about the time the victims were murdered, and the police did not investigate that individual. And while some of the errors identified in this opinion did not result in seriously prejudicial evidence being admitted against defendant, the same cannot be said for other errors. For instance, the first detective's repeated statements that defendant was guilty were serious errors, see *Bynum*, 496 Mich at 633, even if those errors alone would not entitle defendant to a new trial. But we are not looking at whether those errors alone would entitle defendant to a new trial because other errors occurred during defendant's trial; the jury heard inadmissible hearsay evidence, other-acts evidence, and incriminating statements that defendant made after he was denied his right to counsel during the custodial interrogations. Though less seriously prejudicial and to some degree mitigated by other evidence, all of this evidence was still prejudicial to defendant. So, while standing alone these errors may not entitle defendant to a new trial, we are convinced that the serious errors identified in this opinion combined with the multitude of other errors that occurred during defendant's trial deprived him of a fair trial. In other words, the cumulative effect of the errors identified in this opinion undermine our confidence in the reliability of the jury's verdict, which warrants a new trial. Accordingly, we vacate defendant's convictions and remand for a new trial.[6]

Vacated and remanded. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Michael J. Kelly
/s/ Kathleen A. Feeney

---

[6] In light of this conclusion, we need not reach defendant's arguments regarding whether he was competent to waive his right to counsel considering his mental illness, his sentencing arguments, or the allegations of evidentiary error that defendant asserts in his brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4.